**MURPHY et, Plaintiffs, v. PORTER et, Defendants.**

Common Pleas Court, Highland County.

No. 16458. Decided September 24, 1952.

H. S. Pulse, Lynchburg, Wilson & Wilson, Hillsboro, for plaintiffs.

Charles H. Wilson, West Union, for defendants.

(KIRK, J, of Clinton County, sitting by assignment in Highland County.

## OPINION

By KIRK, J.

The plaintiffs, Herman E. Murphy and Hazel Murphy, husband and wife, as buyers under a contract for the sale and purchase of a farm, seek specific performance of the contract from the sellers, the defendants A. R. Porter and Ollie Porter, husband and wife, and their son, Donald Porter. The petition as amended also prays for an accounting of the rents, issues and profits from the farm from February 1, 1951, with judgment therefor in favor of the plaintiffs and for other relief.

Evidence adduced on behalf of the plaintiffs in support of similar allegations in the petition as amended, established the following facts:

The defendants being the owners of a 314 plus acre farm in Highland County, Ohio, upon which they were residing, in October of 1950 listed the same for sale with one A. J. White-

side, a real estate broker of Wilmington, Ohio. Whiteside advertised the farm as for sale in a newspaper. Responding to the advertisement, the plaintiff Herman E. Murphy, a resident of Wilmington, Ohio, was shown the farm by Whiteside. On November 1, 1950, at the farm, Whiteside prepared a contract for the sale and purchase of the farm, using a printed form and filling in the blanks in longhand. The contract at that time was signed by Mr. and Mrs. Murphy and by Mr. and Mrs. Porter. Donald Porter signed the written agreement subsequently at Whiteside's office in Wilmington.

The contract (Plaintiffs' Exhibit A) is dated November 1, 1950, and in form is an offer by the plaintiffs to purchase through Whiteside as agent, the land described in general language on the following terms written on the form in longhand:

"Thirty four Thousand Dollars Twenty thousand cash and loan of Twelve Thousand Loan to be given to A. R. Porter for three years with Privalege Paying before Date of Maturity Interest to be Paid annually 5% Interest. Payment to be Paid in full January 24, 1951 Possession February 1st 1951 on or about"

Printed provisions provide for conveyance of clear title by warranty deed, no date for delivery being specified, with seller to pay taxes then a lien. The form also contains the following printed provisions: "This transcation shall be closed within ten days of acceptance thereof or as soon thereafter as possible."

Another paragraph of the form is as follows: "I hereby deposit with you (referring to the agent) $2500.00 (written in) earnest money to be held by you in trust until this proposal, or any modification thereof which I may approve, is accepted, and all conditions fulfilled. If not accepted, the deposit shall be returned in full. It is understood and agreed by all parties concerned that the earnest money deposited herein shall be a part of and included in the full purchase price as mentioned above."

The acceptance portion of the contract, signed by the defendants is dated November 1, 1950, accepts the proposal and agrees to pay the agent a commission of $1000.00 to be withheld from the earnest money if sellers fail to perform within 30 days of acceptance.

At the time of the execution of the contract, the plaintiff Herman E. Murphy gave a check to Whiteside in the amount of $2500.00 drawn on The First National Bank of Wilmington, Ohio, payable to the order of "Whiteside Realty Company" containing the following notation on its face: "Down pay-

ment on A. R. Porter farm. To be deposit in trust as per contract." (Plaintiffs' Exhibit B). The clerk cleared the bank November 2, 1951. Its proceeds were deposited by Whiteside in an account in that bank.

Whiteside died in December of 1950, a resident of Clinton County, Ohio. His son Grant T. Whiteside, qualified as his administrator. After some delay, the administrator got a department of taxation release of the $2500.00 on January 27, 1951, when it was transferred to his account as administrator at the bank.

On January 2, 1951, A. R. Porter swore to an affidavit of claim against the estate of Whiteside for $2500.00 (Plaintiffs' Exhibit C). At some later date, not established by the evidence, it was presented to the administrator by whom it was rejected on a date not established by the evidence. At a date not fixed by the evidence, Porter sued the administrator on the claim in the Common Pleas Court of Clinton County, Ohio, where the cause is still pending.

Meanwhile during November of 1950 and in January of 1951, prior to the 25th of that month, with the consent of the Porters, the Murphys moved certain machinery, feed, hog boxes and equipment on to the farm, making several trips for that purpose.

Following the execution of the agreement, the Porters, father and son, made several trips to Kentucky, where they had formerly lived, looking for another farm.

On January 1, 1951, Herman Murphy went to the farm and advised the Porters of Whiteside's death. The possibility of a delay in closing on this account was discussed. Murphy then told the Porters that he had sold a farm which he owned and that he would be ready to close with them at any time after January 8, 1951. The Porters expressed approval.

At about this time a pipe burst on the farm and by agreement between the parties it was replaced, the Porters paying for the pipe and the Murphys for the labor.

On January 6, 1951, Herman Murphy returned to the farm and talked with Mrs. Porter who told him that her husband and son were in Kentucky. He advised Mrs. Porter that he had concluded the sale of his farm and would be ready to settle at any time the deed from the Porters was ready for delivery.

On January 15, 1951, Grant Whiteside went to the Porter farm and talked with Mrs. Porter, A. R. Porter and Donald Porter not being present, and asked her for the old deed so that he could have a new one prepared for delivery to the Murphys. She made no reply to this request.

On January 18th, Whiteside made another trip to the farm, not having received the old deed, but found only the Porters' daughter there. He did not get the old deed.

On January 25, 1951, Franklin Murphy, son of the plaintiffs, went to the Porter farm and discussed with Donald Porter the matter of a purchase of some of the chattel property belonging to the Porters. Nothing was said about the closing of the farm transaction by the Porters on this occasion.

On January 30, 1951, Grant Whiteside again went to the farm where he found Mr. and Mrs. Porter as well as Donald. They told him that the deed was not ready. Whiteside said that the $2500.00 had been released and that he was ready to apply it on the purchase price and the Porters then agreed to go to Hillsboro on February 1, 1951, to have the deed prepared and to close the transaction. No objection was made then that the date for closing had passed. No demand was made at that time for the $2500.00.

Whiteside advised the plaintiffs of the time and place fixed for closing.

On January 31, 1951, Franklin Murphy made another trip to the farm with more personal property, but was told by Donald Porter that the "deal was off" and that he could not leave the personal property.

On the morning of February 1, 1951, Mr. and Mrs. Murphy went to the Porter farm and Herman Murphy told the Porters that they were prepared to close. A. R. Porter said that they were too late, that the contract had expired, "you didn't bring me the money" and that he would not let them have the farm. Some discussion followed between them, the Murphys contending that they were prepared to pay and demanding that the Porters go through with their part of the bargain. The Porters admitted their agreement to close on February 1st, made with Whiteside, but refused to do anything more about the transaction. The Murphys admit that they did not formally offer the Porters any money or any check on this occasion following the Porters' refusal to go ahead with the transaction.

After the Murphys left, Grant Whiteside came to the Porter farm. The Porters told him that they were not going through with the transaction but gave no reason. No demand was made by the Porters for the $2500.00 or any part of it.

Being called by the plaintiffs as on cross examination, A. R. Porter, while not being sure as to the various dates, did not deny any of the facts above recited. He admitted being told by his daughter that the Murphys had said they would be ready to close any time after January 8th and to send the

deed to Wilmington. He admitted that he did not do this and never had had a new deed prepared for delivery to the Murphys, his explanation being that he didn't think he should do anything about a deed until he got his money, whether he was referring to the $2500.00 earnest money or the balance of the purchase price is not clear.

He also admitted agreeing on January 31st to close the transaction on February 1st, but explains this by saying that he had not read the contract since its execution at that time and had in mind that the contract provided for closing on February 1st and that later on reading it again, he saw that the contract "expired on January 25th". He admitted that he was not expecting to close on January 25th; that he did not expect the Murphys on that date and did not recall whether or not he was at home on that date. He further admitted that he and his family were sorry that they had made the contract after they had done so.

Subsequent to February 1, 1951, the Porters entered into an agreement to sell the farm to another party for $35,000.00, subject to their prevailing in this suit. That party has been in possession of the farm as a tenant for some time.

A bank statement such as routinely and periodically supplied by The First National Bank of Wilmington, Ohio, to its customers was received in evidence as Plaintiffs' Exhibit D. It shows that Herman E. Murphy had a balance in excess of $23,000.00 continuously from January 5th until February 8th, 1951.

On cross examination, the plaintiff Herman E. Murphy admitted that at no time before, on or subsequent to January 25, 1951, had he actually tendered the balance of the purchase price in cash to the Porters, nor tendered a purchase money mortgage, except as might have been inferred from his statement to them of being able and ready to close at any time after January 8th and his statements made on February 1st, to the effect that he had come to conclude the transaction.

At the close of plaintiffs' case, the defendants orally demurred to the evidence, moved for judgment in their favor and for a dismissal of the petition as amended, contending (1) that time was of the essence of the agreement and that the agreement provided for payment of the balance on January 25, 1951, (2) that there was no tender by the plaintiffs and that a tender must be made before an action can be maintained on a contract such as here and (3) that if there was an agreement made on January 30th to close on February 1st, it was without consideration and violated the statute of frauds as not being in writing.

These contentions have been fully argued orally and by brief by counsel on both sides with numerous citations of authority, furnished the court.

Is time to be considered of the essence of this agreement in this suit in equity for specific performance? It is not made so by express provision in the contract. The hand written provisions of the contract provide "Payment to Be Paid in full January 25, 1951 Possession February 1st 1951 on or about." The printed portion of the contract form provides that "This transaction shall be closed within ten days of acceptance thereof or as soon thereafter as possible." No time is fixed for delivery of the deed. There is no provision as to time for forfeiture of the down payment of $2500.00.

Prior to January 31st, 1951, there is nothing in the conduct of the parties to indicate that either side considered time to be of the essence. The buyers offered to pay at any time after January 8th. The sellers on January 30th consented to close on February 1st—the day fixed for the giving of possession. The sellers now say that on January 30th they were under the impression that the contract provided for a closing on February 1st—further evidence that the sellers were not concerned about payment on January 25th.

Undoubtedly a contributing factor in the delay of time for closing was the death of Whiteside—the sellers' agent. The $2500.00 down payment money was not available in the hands of the administrator until January 27th because of the necessity for procuring a tax release. Surely this delay should not be permitted to be prejudicial to the buyers.

The court can only infer that the Porters were not concerned about time until January 30th, when after agreeing to close on February 1st, the contract was re-read and they discovered that January 25th was fixed for payment. They were sorry that they had made the contract by this time and were looking for some excuse to avoid it.

"Time of performance is not of the essence of a contract unless made so by its terms or by the act of the parties. . ." **Syllabus 4, Hubbard v. Norton, 28 Oh St 116.**

"Ordinarily in equity, time is not of the essence of a contract unless it has been made so by the express terms of the contract or has been so treated by the parties, or is necessarily so from the nature of the contract." **Brock v. Hedy, 13 Oh St 306.**

A somewhat exhaustive discussion of the subject of time of performance of contracts involving the sale of real property appears in the opinion of the U. S. Circuit Court for Ohio, in Longworth v. Taylor, 1 O. F. D. 643. At page 646 of the report appears the following language:

"At law, time is always an essential part of a contract; but in chancery the court consider it in connection with the circumstances of the case. The rule at law is so inflexible as not to admit of any excuse, however strong, for a failure to perform the contract at the time fixed. But it is otherwise in chancery. Not that chancery disregards time as immaterial, but if the party can show that he has been prevented by inevitable accident or by any justifiable excuse from performing his part of the contract at the time stipulated, and the other party has suffered no material injury by the delay, the court will not withhold its aid."

and again at page 648:

"In looking to the facts of the case under consideration it appears that time was not made of the essence of the contract. The times at which the payments were to be made and the period within which the deed was to be executed were fixed in the contract; but there was no expression that a failure in any of these should avoid the agreement."

The subject is treated in Williston on Contracts, Revised Edition by Williston and Thompson, 1936, Volume 3, as follows:

Paragraph 845, page 2370. "The courts of equity in England and America have treated stipulations as to time as subsidiary and of comparatively little importance, unless either the language of the parties or the nature of the case imperatively indicate that the date of performance is vital. In courts of common law, however, and especially in mercantile contracts, it is held that time is of the essence of the contract."

Paragraph 852, page 2384. "In contracts for the sale of land, equity has established the rule that unless expressly made so by the terms of the contract or by special circumstances, time is not essential."

Page 2386. "The amount of delay which a court of equity will permit and still enforce the contract at suit of the party in fault will vary according to the equities of the particular case both extrinsic to the contract and involved in the contract itself."

Paragraph 276, at page 406 of Volume 1 of the Restatement of the Law of contracts of the American Law Institute, reads in part as follows:

"RULES FOR DETERMINING MATERIALITY OF DELAY IN PERFORMANCE.

"In determining the materiality of delay in performance, the following rules are applicable.

(a) "Unless the nature of a contract is such as to make performance on the exact day agreed upon of vital import-

ance, or the contract in terms provides that it shall be so, failure by a promissor to perform his promise on the date stated in the promise does not discharge the duty of the other party

(d) "In contracts for the sale or purchase of land delay of one party must be greater in order to discharge the duty of the other party than in mercantile contracts.

(e) "In a suit for specific performance of a contract for the sale or purchase of land, considerable delay in tendering performance does not preclude enforcement of the contract where the delay can be compensated for by interest on the purchase money or otherwise, unless

(i) "the contract expressly states that performance at or within a given time is essential, or

(ii) "the nature of the contract, in view of the accompanying circumstances, is such that enforcement will work injustice."

The following illustration is given on page 409:

"A agrees to sell, and B to buy Blackacre, for the price of $10,000, the transfer to be made on March 1. A tenders performance on March 1. B then states that he wishes to carry out the contract but has not the necessary price at the moment. A replies that unless immediate performance is made he will not carry out the contract. On the following April 1, B sues for specific performance, making an offer in his pleading to pay with interest the agreed price. The contract may be specifically enforced."

The case at bar was filed February 6, 1951. In our case, that which was objected to by the defendants was a delay of seven days from January 25th until February 1st. There was a delay of only thirteen days between January 25th and the filing of the petition. The petition tendered the purchase price balance. As possession was not to be given under the contract until February 1st, we cannot see that the defendants suffered any material injury by the delay

The court concludes that time shall not be considered of the essence of the contract in this case.

The second branch of the demurrer and motion raises the question of tender.

"The general rule is that a party seeking specific performance of a contract must show performance on his part, yet there are clearly defined exceptions and one of them is that when the other party repudiates and makes it certain that he does not intend under any circumstances to comply, a showing of readiness and ability on the part of the complaining party to then and there perform communicated to the

other party and accompanied with a demand of compliance by such other party is sufficient compliance without an actual formal tender." **Brewing Co. v. Maxwell, 78 Oh St 54.**

"On case of renunciation or absolute and unconditional refusal to proceed with the contract on the part of one of the contracting parties, the law excuses the absence of tender on the part of the other party to perform, as a court of equity does not require idle acts. **Sirillo v. Sabolovich 2 Abs 650.**

"To the same effect see also **Whitacre v. Hoffman, 50 Abs,** 493 and Sandford v. Harbage, 15 C. C. (N. S.) 298."

Here the buyers having gone to the home of the sellers at the time fixed for closing by the sellers, although differing from that provided for in the contract, and having announced their readiness to close the transaction were met with refusal by the sellers because "the time had expired." The sellers did not complain because the offer to pay was by check. The only reason given by the sellers for their refusal to perform was that payment had not been made on January 25th.

Under the authorities above cited, the court concludes that no further act on the part of the buyers by way of a formal tender was required as a condition precedent to the right of the buyers to sue for specific performance. The court feels that the decision in the case of **Domigan v. Domigan, 46 Oh Ap 542,** relied upon by the defendants, is not in accordance with the weight of authority. In any event this court is not obligated to follow that decision since it was decided by the court of another judicial district.

Having decided that time is not to be considered of the essence of the contract under consideration and that the requirements of tender were satisfied by the buyers, the third branch of defendants' demurrer and motion becomes moot. As buyers have acted within the time and in such manner as to justify a decree of specific performance in their favor on the original contract, it is unnecessary to decide whether the sellers' agreement of January 30th to close on February 1st was supported by consideration or violated the statute of frauds.

Inasmuch as no evidence was offered as to the rents and profits of the farm since February 1, 1951, the court can make no accounting thereof. Presumably the farm has produced some rental since the defendants testified that it had been rented. And while in the ordinary situation in decreeing specific performance the court attempts to put the parties in the position which they would have been in had the contract been carried out, in this instance the court cannot decree the rents and profits to the plaintiffs, so it will not decree

interest on the purchase money to the defendants but will consider that the rents and profits offset the interest.

Counsel for the defendants having stated in open court that the defendants did not propose to offer evidence and would let the cause be decided on their demurrer and motion, it will be the decree of the court that the plaintiffs within ten days of the entry of the decree to be drawn hereunder pay to the clerk of this court $19,500.00 and deliver to the clerk their note dated as of the date of the journal entry, payable to the order of A. R. Porter in the amount of $12,000.00, due on or before at the option of the makers, three years from date bearing interest at the rate of 5 per cent per annum, payable annually, and that contemporaneously with the delivery of a deed for the premises described in the petition, the plaintiffs execute a mortgage on said premises securing the payment of said note and deliver the same to the clerk. Or, at the option of the plaintiffs, they may instead of depositing said note, deposit with the clerk an additional $12,000.00.

It is the further decree of the court that within ten days of the journal entry to be drawn hereunder, the defendants execute and deposit with the clerk a proper warranty deed conveying the premises described in the fourth amended petition to the plaintiffs free and clear of all encumbrances, including the lien of taxes and assessments; that the defendants shall prior to the delivery of such deed to the clerk discharge such encumbrances, including the lien of taxes and assessments.

As soon as the parties have performed as hereinbefore ordered, the clerk shall deliver said deed to the plaintiffs and such payment money, whether all cash or part cash and part evidenced by note and mortgage, to the defendants.

Should either the plaintiffs or the defendants fail to comply with the order of the court as hereinbefore set out, on application and showing by the party not in default, the court will make an appropriate order to carry out its decree.

The plaintiffs shall recover their costs from the defendants.

An entry drawn in accordance herewith shall be prepared by counsel for the plaintiffs, submitted with copy to counsel for the defendants for approval as to form and then to the court.